UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


ANDTHONY RAY SPEARS,      :
    Plaintiff          :
                      :
    v.                  :        CIVIL NO. 1:13-CV-03053
                      :
JOSEPH A. CURCILLO, *et al.*,    :
    Defendants      :

*M E M O R A N D U M*


## I.    Introduction

In this prisoner lawsuit, the *pro se* plaintiff, currently imprisoned at SCI Rockview, raises a bevy of claims stemming from his confinement at the Dauphin County Prison ("DCP").  Pending before the Court is a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    Background

Plaintiff, proceeding *in forma pauperis*, (see Doc. 13), initiated this lawsuit on December 19, 2013, by filing a civil complaint.  (Doc. 1).  Plaintiff names the following 31 defendants therein: (1) Joseph Curcillo III ("Curcillo"), Chief Solicitor for Dauphin County; (2) Frank Lavery Jr. ("Lavery"), Solicitor for the Dauphin County Prison Board; (3) Jeffery Haste ("Haste"), a Dauphin County Commissioner; (4) Dominic DeRose ("DeRose"), Warden at the DCP; (5) Leonard Carroll ("Carroll"), Deputy Warden of Security at the DCP; (6) Elizabeth Nichols ("Nichols"), Deputy Warden of Treatment Operations at the DCP; (7) Dennis Stewart ("Stewart"), a Correctional Officer at the DCP holding the rank of Security Major; (8) Patrick Corkle ("Corkle"); (9) Mark Jeszenka ("Jeszenka"); (10) Andrew Klahar

("Klahar")[1]; (11) Mark Neidigh ("Neidigh"), a Correctional Officer at the DCP who held the ranks of Lieutenant and Captain; (12) Ted Zimmerman ("Zimmerman"); (13) Joseph Carnazzo ("Carnazzo"); (14) Walter Hostetter ("Hostetter"); (15) Russell Hewitt ("Hewitt"); (16) Steve Smith ("Smith"); (17) Kennith Cramer ("Cramer")[2]; (18) Ellen Debolpi ("Debolpi"), a Correctional Officer at the DCP holding the rank of Sergeant; (19) Alek Peters ("Peters"); (20) Donald Faukler ("Faukler"); (21) FNU Danner; (22) Gerald Walton ("Walton"); (23) Daniel Hostler ("Hostler"); (24) Randy Pope ("Pope"); (25) Mike Frankenstein ("Frankenstein"); (26) Steve Singleton ("Singleton"); (27) Jeromy Cline ("Cline"); (28) FNU Swanson[3]; (29) Jason Shay ("Shay"), a Correctional Officer at the DCP, rank unknown; (30) Connie Orosz ("Orosz"), a Supervisor in the Education Department at the DCP; and (31) Jim Yanic ("Yanic"), a Supervisor in the Medical Department at the DCP.  (Doc. 1 at ¶¶ 4-17).  These defendants are sued in their individual and official capacities.  (Id. at ¶ 18).

As mentioned, plaintiff's complaint stems from his detention at the DCP.  (Id. at ¶¶ 3, 21).  In particular, plaintiff alleges[4]:

A. *Gym Access, Exercise, Out-of-Cell Time, and Showers*

From November 18, 2011 to March 18, 2012, plaintiff was denied access to the gym and participation in recreational activities.  According to plaintiff, these restrictions were imposed on him after it was determined that he had stolen an officer's water bottle

---

[1]     Plaintiff alleges that Corkle, Jeszenka, and Klahar were all correctional officers at the DCP, holding the rank of Captain.

[2]     Plaintiff alleges that Zimmerman, Carnazzo, Hostetter, Hewitt, Smith, and Cramer were Correctional Officers at the DCP, holding the rank of Lieutenant.

[3]     Plaintiff alleges that Peters, Faukler, Danner, Walton, Hostler, Pope, Frankestein, Singleton, Cline, and Swanson were all Correctional Officers at the DCP, holding the rank of Petty Officer.

[4]     At all relevant times in the complaint, plaintiff claims to have been held in the Restricted Housing Unit ("RHU").

while being transported from the gym.  Plaintiff appealed the imposed restrictions through the prison's administrative grievance process, asserting that he was only playing around with the officer when he came into possession of the water bottle.  Nonetheless, he was found guilty of having committed a violation and was sanctioned accordingly.

Plaintiff was also denied gym access from April 10 to October 6, 2012, and on October 8, 11, 29, and 30; however, he does not attempt to explain why.  Nonetheless, as a result of not having gym access, plaintiff claims that he was altogether prohibited from meaningful exercise since he was not otherwise permitted to exercise in the areas to which he had access during the one-hour time period that he was allowed to leave his RHU cell.

In addition to not having gym access, plaintiff claims that from August 20-28, 2012, he was also denied the privilege of remaining outside of his RHU cell for one hour each day.  This restriction was imposed on plaintiff because of the conduct of other inmates also detained in the RHU.

From July 10-20, 2012, plaintiff was housed in a more restrictive area in the RHU where he was only permitted to be outside of his cell for 30 minutes each work day.  On Mondays, Wednesdays, and Fridays, said 30 minutes was solely allotted for time to shower.  While showering, plaintiff was required to wear shackles and cuffs.  On Tuesdays and Thursdays, during the allotted 30 minutes, plaintiff was permitted to clean his cell.  During that time, plaintiff similarly remained handcuffed and shackled.  Given that the allotted 30 minutes each work day were for other uses, plaintiff claims that he was denied the opportunity for meaningful exercise.  He also complains that he did not have adequate showers.  Furthermore, plaintiff complains that when he had an opportunity to exercise, he lacked adequate shoes.

3

### B. Corrective Lenses

Plaintiff alleges that on the standard 20/20 optical examination he cannot see the large "E;" thus, he requires corrective lenses.  When plaintiff was committed to the DCP, however, Peters took plaintiff's contact lenses away from him without replacing them.  Plaintiff does not explain why, or for what apparent reason, Peters took the contact lenses, other than to allege that Peter's actions were blamed on another inmate.

Ultimately, plaintiff was seen by an optometrist who prescribed eyeglasses.  The optometrist, though, allegedly prescribed the wrong corrective lenses.  As a result, plaintiff immediately returned the lenses to a nurse.  The Medical Department, though, would deny plaintiff with a correct prescription.  Consequently, plaintiff claims that he suffers tension headaches from having to strain his optical nerves.

### C. Personal Property

On December 28, 2011, plaintiff claims that Cline threw away $50 worth of personal property.  Through the inmate grievance procedure, plaintiff requested that his personal property be replaced, but the grievance was denied.

Nearly half a year later, on July 23, 2012, plaintiff received an incident report stemming from a fight between other inmates on his cell block.  Plaintiff alleges that he was not involved with that incident, yet he received the incident report.  Thereafter, plaintiff was sanctioned to serve "180 days lock in," and was placed on "strip-cell" status meaning he was only able to possess a blanket, a prison uniform, and a mat to sleep on.  All other items, including hygiene items and bed linens were confiscated.  Plaintiff's legal materials had also been temporarily confiscated after receiving the incident report, but they were returned to him within 20 minutes of being confiscated.

### D. Reading Materials

From September 2010 to May 2013, plaintiff claims that he was denied all reading materials except for educational and religious ones.  Plaintiff, however, was not eligible for educational reading materials because he was neither an inmate enrolled in a local school district nor under 21 years of age.

### E. Plaintiff's Criminal Matters

"For a period of approximately six months," plaintiff proceeded *pro se* in a criminal matter, in which he was charged with burglary and receiving stolen property.[5] During that six-month period, DeRose restricted plaintiff to possession of 10 "legal copies" per week, which allegedly prevented him from obtaining legal knowledge to apply in his criminal case.  Thus, plaintiff withdrew his *pro se* status and was appointed an attorney to represent him.  Plaintiff disagreed with appointed counsel's strategy and was ultimately found guilty of the crimes charged.

As well, on March 5, 2013, plaintiff was criminally charged with, *inter alia*, attempted escape.[6]  Plaintiff chose to proceed *pro se*, and DeRose, Nichols, and Carroll were notified of his choice to do so.  In preparation for a preliminary hearing, plaintiff requested that he be permitted to use the law library at the DCP.  These defendants, however, only permitted plaintiff to use the law library for one hour, two days before the hearing was scheduled.  Additionally, in the two months leading up to the preliminary hearing, plaintiff claims that he was not permitted to receive or possess any legal books or

---

[5]     We take judicial notice of plaintiff's criminal docket sheets in *Commonwealth v. Spears*, Nos. CP-22-CR-0005226-2010 & CP-22-CR-0005227-2010, available through Pennsylvania's Unified Judicial Docket System docket research at: http://ujsportal.pacourts.us/.

[6]     We also take judicial notice of plaintiff's criminal docket sheet in *Commonwealth v. Spears*, CP-22-CR-0002198-2013.

publications to study inside of his RHU cell.  According to plaintiff, had he been given more time in the law library and / or legal resources to possess inside of his cell, this particular criminal matter would not have been bound over to a Court of Common Pleas.

F.  *March 5 to May 7, 2013*

On March 5, 2013, plaintiff claims that he was called as a witness to testify in favor of another DCP inmate, who was charged with, and eventually acquitted of, assaulting correctional officers.  Thereafter, until his transfer to a State Correctional Institution on May 7, plaintiff claims that he was retaliated against in various ways while confined in the DCP's RHU.

Specifically, according to plaintiff, upon his return to the DCP, after testifying, he was sent to a segregation unit inside of the prison.  Plaintiff would remain there from March 5-14, 2013.  During this time, plaintiff was only twice permitted to shower, brush his teeth, and put on deodorant.  Plaintiff was also on "strip-cell" status while housed in the segregation unit.  Consequently, Singleton removed plaintiff's personal property from his cell, including some legal materials and a Bible, which were eventually lost or destroyed "by someone employed" at the DCP.  As well, the segregation cell was cold, feeling as though it were 45 degrees; he had no undergarments; he was only provided with cold-cut sandwiches and milk; he was denied gym access and meaningful exercise; the cell was unsanitary; and the lights remained on 24/7.

On March 14, 2013, plaintiff was transferred from the segregation unit back to a block on the RHU where he had been previously detained.  Over the course of the next month, plaintiff would be moved seven times to various cells on the same RHU block.

On Monday, March 18, plaintiff was moved into a cell that was unsanitary. According to plaintiff this cell had human hair on the floor; a urine odor; and human feces smeared on the toilet, floor, and walls.  Plaintiff immediately reported these conditions to Singleton.  In response, Singleton informed plaintiff that he needed approval from Stewart to obtain cleaning supplies, because individuals housed in the RHU are only permitted to clean their cells on Tuesdays and Thursdays.  Stewart, however, rarely appeared on plaintiff's cell block and was "responsible for many of the other problems . . . plaintiff was subjected to." As such, plaintiff used his own wash cloth, soap, and bare hands to clean the cell.  The smells did not go away despite plaintiff's cleaning efforts.  Plaintiff was subsequently, and strategically, moved in and out of this cell, denying him the opportunity to clean it with cleaning supplies, on the cleaning days.  In total, plaintiff spent approximately seven days in this cell before being provided with an opportunity to clean it with cleaning supplies.

Additionally, on March 20, 2013, Frankenstein issued an incident report to plaintiff, accusing him of ripping a mat used to sleep on.  Almost immediately after receiving the incident report, plaintiff was escorted to meet with Neidigh.  Plaintiff claims that Neidigh was disrespectful and indirectly threatened him.  Subsequently, despite plaintiff's denial that he committed the act for which he was accused, Neidigh placed plaintiff on a 12-hour mat restriction, meaning that plaintiff could solely possess a mat during the night hours.  When the mat was not with plaintiff, it was to be placed outside of his assigned cell.

The next day, on March 21, plaintiff filed a grievance regarding this issue.  In response, DeRose sent a representative from the Mental Health Department to speak with plaintiff.  Afterwards, despite the fact that the representative from the Mental Health Department purportedly stated that he did not believe plaintiff was suicidal, he (i.e., the

representative) placed plaintiff on a 15-minute suicide watch, because DeRose had required him to do so.  As such correctional officers were required to check on plaintiff every 15 minutes, including during the night hours.[7]  On the same date, plaintiff was also issued a new mat.

A couple of days later, on March 24 and 25, 2013, respectively, plaintiff was awakened during the early morning hours for a body-cavity and cell search.  Plaintiff complains that these searches interrupted his sleep, which was already limited since he only possessed a mat during the night hours.  Furthermore, on the March 25 occasion, after he had gone back to sleep, plaintiff claims that maintenance entered his cell to fix a light.  Meanwhile, plaintiff remained cuffed to the stairwell, and it took maintenance 30 minutes to complete the job.  Moreover, after finishing the job, maintenance twice flushed plaintiff's toilet causing it to lock for an hour to prevent flooding.  Simultaneously, plaintiff was also prevented from being able to use the toilet.

On March 25, plaintiff also complains that while correctional officers were retrieving mats for inmates newly assigned to the RHU, Miller came over to plaintiff's cell and went to grab his mat.  Plaintiff, though, was standing at his cell door and informed Miller that the mat belonged to him.  Miller thus left plaintiff's mat outside of his cell.  Pope, however, had overheard the conversation between Miller and plaintiff, and he instructed Hostler to grab plaintiff's mat.  Hostler did as instructed.  Plaintiff began explaining the mat restriction imposed upon him to both Pope and Hostler, but they walked away laughing.  In exchange, plaintiff received the same mat for which he had originally been accused of ripping.

---

[7]        Plaintiff does not allege for how long he was placed on suicide watch.

Having received the same problematic mat as before, plaintiff notified Debolpi, who returned plaintiff's replacement mat that had been taken by Pope and Hostler. Debolpi also took the other, ripped mat from plaintiff's possession and placed it under a staircase. According to plaintiff, Debolpi "did the right thing." When Pope and Hostler learned what Debolpi had done, they placed a mat outside of plaintiff's cell that was in an even worse condition than the first replacement and the one for which he received an incident report for ripping.

Later that evening, plaintiff was escorted out of his cell to go shave. Frankenstein stayed behind to search plaintiff's cell. After the search, when plaintiff was permitted to return to his cell, he discovered that his legal materials had been scattered about. Plaintiff, though, was able to reorganize those materials. Thereafter, plaintiff was presented with the mat that was in a worse condition that the previous two. Around midnight, before his cell-door closed, plaintiff tossed said mat outside of his cell and did not have another one to sleep on.

The following evening, on March 26, Shay and a second, unknown, correctional officer opened plaintiff's cell-door to bring him the same mat that he (i.e., plaintiff) had discarded the night before. Plaintiff stood in the doorway of the cell to prevent that mat from being placed inside. In response, Shay pushed plaintiff in the chest and threw the mat inside plaintiff's cell. Around 11:00 p.m., after being permitted to clean his cell with cleaning supplies, plaintiff once again tossed the mat outside of his cell.

Early the next morning, on March 27, plaintiff informed Walton that his toilet had become clogged. Walton called maintenance. As plaintiff explained to maintenance how the toilet became clogged, Walton appeared to become upset and said to plaintiff

"when maintenance leaves, you're stripping!"  Indeed, after maintenance had left, plaintiff

was required to undergo a body-cavity, strip search.  During the search, plaintiff was

required to hand Walton each article of clothing for inspection.  Walton threw each article of

clothing he received into toilet water that had fallen onto the floor while maintenance worked

on his clogged toilet.  Walton also threw plaintiff's other personal property in the same toilet

water and took plaintiff's mat.  Upon taking plaintiff's mat, Walton placed it on a table to

search inside of it.  Walton also allegedly shouted to the other inmates on the cell block: "I

will give you an extra tray [of food] every day I work if one of you will fuck up this dumb ass

white boy the first change you get!"[8]

    Later, on the same day, the drain outside of plaintiff's cell began to omit

sewage.  Plaintiff's assigned mat was placed directly over the drain and absorbed some of

the sewage.  The sewage also seeped into plaintiff's cell.  Plaintiff immediately notified

Shay, who called for maintenance to clean up the mess.  Shay allegedly informed plaintiff

that his superiors would not permit him to provide plaintiff with a new mat.  Thus, when the

time came for plaintiff to accept his mat, he did so, but eventually he would toss it outside of

his cell.  Thereafter, while he was taking a shower, Frankenstein searched plaintiff's cell.

Frankenstein ended up issuing plaintiff another incident report for damaging the mat he

continued to refuse.  As a consequence, plaintiff was placed on "strip-cell" status, and

complains that he could not sleep for the three days.  Plaintiff further complains that during

this period of time, when he could not sleep since he did not have a mat to his likening, he

suffered severe pains throughout his body and suffered extensive mental anguish.

---

[8] Plaintiff never alleges whether any inmates attacked him, or tried to do so, after Walton allegedly made this statement.

On April 4, 2013, plaintiff's legal materials were searched and examined by Swanson and Debolpi. These defendants allegedly ripped out the staples from plaintiff's materials and "destroyed many of [the] documents in the process," some of which were allegedly irreplaceable. Plaintiff filed grievances seeking replacements for some of the destroyed legal documents, but none were provided to him.

On April 21, 2013, plaintiff received breakfast. The food was allegedly uncooked. In particular, the grits were "hard and crunchy" and the sausage was cold. Plaintiff asked Singleton to provide him with a replacement tray, but Singleton refused. Subsequently, when Singleton came to collect the trays, plaintiff would not turn it over until he received another one. Singleton was thus required to call on two additional correctional officers to go into plaintiff's cell and take the tray.

In summary, plaintiff explains that throughout this three month period, from March to May 2013, he was required to submit to 139 body-cavity and cell searches, and that the searches were conducted by a "handful" of correctional officers. Plaintiff further claims that he complained to the Medical Department about his physical pain. In turn, he received Motrin. Also, when he complained to the Mental Health Department, plaintiff claims that nothing was done for him.

Plaintiff also claims that during this same three-month period, he was not provided with commissary privileges; thus, he was unable to send personal and / or legal mail. Similarly, plaintiff complains that he lacked visiting and phone privileges, and was "deni[ed] . . . access to the courts." As well, plaintiff complains that his gym access and out-of-cell time were restricted and the lights in the RHU were kept on 24/7 interfering with his ability to sleep and causing him additional mental anguish and pain and suffering.

### G.  Allegations Tied to the Incident Reports

Plaintiff complains that the evidence relied upon to sanction him for the incident reports he received was insufficient.  Similarly, plaintiff alleges that he was not given the opportunity to present evidence or call witnesses, he was not provided with copies of the incident reports, and the reason for his sanctioning was not explained in detail.

### H.  July 25 to August 13, 2013

On July 25, 2013, plaintiff, who was on a writ, was transferred from SCI Benner Township back to the DCP.  This time, he would remain at the DCP until August 13, 2013.[9]  When he arrived back to the DCP, he was placed into the RHU with another damaged mat.  Plaintiff complained about the mat in his cell, and, in response, he was provided with a less damaged one.  As before, plaintiff would not accept the replacement because of the damage already done to it absent a memorandum stating that the mat was already damaged.  No memo was received; thus, plaintiff did not have a mat on the first night back at the DCP.  The next day, DeRose acknowledged the damage to the mat and that plaintiff went without a mat to his likening.

---

[9]  It is unclear from the face of the complaint whether plaintiff was a pretrial detainee or a convicted prisoner during his confinement at the DCP, from September 2010 to May 2013.  However, plaintiff's criminal docket sheets, of which we have taken judicial notice, plausibly suggest that he was a pretrial detainee during this period of confinement, at least until April 18, 2013: the date on which plaintiff was sentenced for burglary and receiving stolen property.  *See Bistrian v. Levi*, 696 F.3d 352, 372 (3d Cir. 2012)(defining pretrial detainees as persons awaiting sentencing); *Cobb v. Aytch*, 643 F.2d 946, 962 (3d Cir. 1981)(en banc).  In light of this reliable evidence, we will proceed as though plaintiff was a pretrial detainee while initially detained at the DCP, except from April 18 to May 7, 2013, when we consider him to have been a convicted prisoner.

During his second period of confinement at the DCP, from July 25 to August 13, 2013, it is less apparent whether plaintiff was a convicted prisoner or a pretrial detainee.  Indeed, plaintiff was apparently still serving a sentence for burglary and receiving stolen property.  Thus, it is not outside the realm of possibilities that plaintiff was a convicted prisoner during this period of confinement.  Absent briefing on the issue, however, we will not reach any conclusions with respect to plaintiff's status during this stay at the DCP.

Throughout the three weeks that followed, plaintiff was placed into four different cells.  Nichols, however, approved plaintiff to receive and possess novels while housed in the RHU.  On August 5, 2013, Frankenstein took one of plaintiff's books despite Nichols' approval.  Moreover, plaintiff from August 10-13, plaintiff went without a shower.

### I.   Claims and Relief Sought

Based on these allegations, plaintiff claims that his rights guaranteed under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated in that he was subjected to unconstitutional conditions of confinement; the denial of religious freedom; unreasonable searches; the denial of free speech; the denial of due process; unconstitutional mistreatment; and the denial of access to courts.  Plaintiff raises these claims pursuant to 42 U.S.C. § 1983.[10]  Plaintiff also avers that he raises state-law claims.  For remedies, plaintiff requests: (1) a declaration that his constitutional rights were violated; (2) injunctive relief, ordering the defendants to ensure that the constitutional rights of individuals housed at the DCP are protected; and (3) compensatory and punitive damages.

After waiving service, the following defendants filed a motion to dismiss under Rule 12(b)(6): Curcillo, Lavery, Haste, DeRose, Carroll, Nichols, Stewart, Jeszenka, Klahr, Neidigh, Zimmerman, Hostetter, Hewitt, Smith, Depolpi, Peters, Faukler, Danner,

---

[10]     Section 1983 "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).  This statute "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.*  To establish a claim under § 1983, a plaintiff must show a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law.  *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

Walton, Hostler, Pope, Shay, Singleton, Cline, Swanson, and Orosz.[11]  This motion is ripe for review.[12]

### III.    Legal Standard

A motion filed under Rule 12(b)(6) contests whether the claimant has stated a cognizable claim for relief. In ruling on such a motion, we must accept the claimant's properly pleaded allegations as true, construe them in the light most favorable to the claimant, and determine if, "under any reasonable reading of the pleading, the [claimant] may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  Our analysis consists of two parts: first, separating the "bare assertions" and "legal elements of a claim," and second, determining whether the properly pleaded factual allegations "show" a plausible entitlement to relief.  *See id.* at 210–11; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

In a case such as this, a complaint filed by a *pro se* litigant is also to be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Erickson v. Pardus*, 551 U.S. 89, 94 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, (1976)).  Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

---

[11]     These defendants will be collectively referred to as the "Moving Defendants."  To date, the remaining defendants named in the complaint have not been sufficiently identified in order to effectuate service.

[12]     The Moving Defendants do not identify, or address the pleading sufficiency of, plaintiff's state-law claims.  Moreover, despite filing documents in opposition to the pending dismissal motion, (see Docs. 29 & 36), plaintiff, in large part, does not squarely address the arguments raised by the Moving Defendants.

IV.   Discussion

*A. Defendants Faukler, Danner, and Orosz*

These defendants argue that any and all claims raised against them should be dismissed because plaintiff fails to plead any allegations against them.  (Doc. 35 at 9-10).  Indeed, in the complaint, plaintiff does not set forth specific allegations concerning these defendants.  Plaintiff, instead, lists their names in a chart entitled "defendants responsible for specific issues / grievance #," and next to their names are numbers appearing to correlate to another chart included in the complaint.  In turn, the other chart lists vague descriptions of the claims plaintiff intends to raise.  (See Doc. 1 at 39-40, 41-42; Doc. 36 at 1-2).  Even for a *pro se* plaintiff, this is insufficient for pleading purposes.  Accordingly, we will dismiss the claims intended to be raised against these defendants without prejudice.[13]

*B. Defendants Curcillo, Lavery, Haste, Stewart, Jeszenka, Klahr,
    Zimmerman, Hostetter, Hewitt and Smith*

These defendants argue that plaintiff has failed to show that they were personally involved in any of the alleged constitutional violations; therefore, any and all claims raised against them under 42 U.S.C. § 1983 should be dismissed.  (See Doc. 35 at 10-12).

It is well-established that claims raised pursuant to § 1983 cannot be premised on a theory of *respondeat superior.  Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences underlying a

---

[13]   To the extent the numbers mean something else, plaintiff has failed to adequately apprise us of their meaning.  (See, e.g., Doc. 36 at 1-2).  Similarly, to the extent the same numbers correlate to one of the numerous exhibits attached to plaintiffs' complaint, (see Docs. 1-1, 1-2, & 1-3), we are unable to discern which exhibit(s) is (are) applicable.

claim.  *See Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077 (3d Cir. 1976).  Stated differently, individual liability can only be imposed for a claim raised pursuant to § 1983 if an individual acting under color of state law played an "affirmative part" in the alleged misconduct.  *Rode,* 845 F.2d at 1207-08.  Alleging a mere hypothesis that an individual had personal knowledge or involvement in depriving a plaintiff of his rights is insufficient.  *Id.* at 1208.

With respect to supervisory defendants, a plaintiff must show "1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinate's violations."  *Hunter v. Schouppe*, No. 06-1291, 2007 WL 4554521, at *2 (W.D. Pa. Dec. 19, 2007)(citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997)); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).  Moreover, with respect to policy-making supervisors, they may be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n. 5 (3d Cir. 2010)(quoting *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).  A policy-making supervisor's failure to employ a specific supervisory practice or procedure to correct a known unreasonable risk of constitutional harm also satisfies the personal involvement requirement.  *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

Here, liberally construed, plaintiff impermissibly proceeds against these defendants on a *respondeat superior* theory.  Indeed, plaintiff's complaints against these defendants appear to solely stem from their alleged failure to take corrective action in response to his submitted grievances that they supposedly reviewed and denied.

Allegations of this sort are insufficient to show personal involvement. *See Popovich v. Lamas*, No. 13-1528, 2014 WL 939508, at *3 (M.D. Pa. Mar. 11, 2014)(citing *Rode*, 845 F.2d at 1207).  Premised upon such a theory of liability, the § 1983 claims intended to be raised against these defendants will be dismissed with prejudice.[14]  Plaintiff may otherwise amend his complaint to attempt to show personal involvement of these defendants if he can adequately allege their personal involvement through one of the other theories discussed above.

### C.  Requests for Declaratory and Injunctive Relief

Plaintiff is no longer confined at the DCP; instead, he is imprisoned at SCI Rockview.  This is also not a case where plaintiff is alleging that his constitutional rights have continued to be violated by the defendants or affiliates, and there is nothing in the present record to suggest a reasonable probability that plaintiff will be returned to the DCP in the foreseeable future.  Plaintiff's claims for declaratory and injunctive relief, therefore, will be dismissed as moot.  *See Anderson v. Showalter*, No. 14-330, 2015 WL 1285957, at *7-*8 (M.D. Pa. Mar. 20, 2015).

### D.  Emotional Injuries

The Moving Defendants argue that plaintiff attempts to bring certain claims for emotional injuries without a prior showing of any physical injury.  (Doc. 35 at 29-30).  To

---

[14]     Of course, plaintiff also alleges that: (1) Stewart was "responsible for many   . . . other problems . . . ."; and (2) these defendants falsified their "reports / investigations" when reviewing his grievances and "ordered many of the restrictions" imposed upon him at the DCP.  (Doc. 1 at ¶¶ 59, p. 41).  These allegations, though, are pleaded in an improper, conclusory, manner.

Furthermore, given that Neidigh seemingly agrees that plaintiff alleges personal involvement, but fails to state a valid claim for relief, (see Doc. 35 at 22-23), we disagree with him, (see id. at 10-11), that plaintiff has insufficiently pleaded his personal involvement.  Whether plaintiff states a valid claim for relief against Neidigh is a separate inquiry.

the extent plaintiff so proceeds, this is improper, *see* 42 U.S.C. § 1997e(e), and such claims

will be dismissed with prejudice.

### E.  The Fifth Amendment

Plaintiff avers that he raises Fifth Amendment claims.  (See Doc. 1 at ¶ 117).

It is obvious, though, that none of the named defendants are federal actors.  (See Doc. 1 at

¶¶ 4-17).  Accordingly, since the Fifth "Amendment applies only to federal actors," *Kingsley*

*v. Hendrickson*, 135 S.Ct. 2466, 2477 (2015)(Scalia, J., dissenting), any claims arising

under this Amendment will be dismissed with prejudice.[15]

### F.  Access to Courts

DeRose, Nichols, and Caroll contend that plaintiff fails to state an access-to-

courts claim.  (Doc. 35 at 12-15).  In the complaint, plaintiff claims that he was denied

access to courts in two separate criminal matters, in which, at least initially, he proceeded

*pro se.*

In the first criminal matter, relating to the burglary and stolen-property

charges, plaintiff claims that DeRose restricted him to possession of 10 "legal copies" per

week, despite requesting to possess more.  As a result, plaintiff complains that he could not

adequately represent himself in a court of law and was required to withdraw his *pro se*

status.  After withdrawing his *pro se* status, moreover, plaintiff complains that he was

required to accept the appointment of a public defender who ended up pursuing a legal

strategy that plaintiff did not support, culminating in a guilty verdict.  (See Doc. 1 at ¶ 43).

---

[15]     The Moving Defendants do not seek dismissal of plaintiff's Fifth Amendment claims;
however, we have a continuing obligation to screen complaints filed by plaintiffs proceeding *in forma
pauperis*, *see* 28 U.S.C. § 1915(e)(2), and we will do so in this matter where it is feasible.

In the second criminal matter, relating to the charges for, *inter alia*, attempted escape, plaintiff claims that DeRose, Carroll, and Nichols, only permitted him to use the law library for a single hour, two days before a preliminary hearing, and he was not otherwise permitted to receive or possess any legal publications to study inside of his cell. Consequently, plaintiff alleges that after the preliminary hearing, in which he proceeded *pro se*, the charges in the second matter were bound over to a Court of Common Pleas. (See id. at ¶¶ 44-45).

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). Here, Plaintiff alleges that he lost opportunities to present legal claims in the two criminal matters. In these circumstances, the Third Circuit requires:

> [prisoners to] show (1) that they suffered an "actual injury"— that they lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002). To that end, prisoners must satisfy certain pleading requirements: The complaint must describe the underlying arguable claim well enough to show that it is "more than mere hope," and it must describe the "lost remedy." *See id.* at 416–17.

*Monroe*, 536 F.3d at 205-06. The Third Circuit added that the underlying claims must be pled "in a manner that satisfies Fed.R.Civ.P. 8(a)," *id.* at 206 n. 8 (citing *Harbury*, 536 U.S. at 417–18), meaning that an inmate must present a short and plain statement of each claim said to have been lost by a defendant's conduct. The inmate must also plead facts showing how his claims "may no longer be pursued as a result of defendant's actions." *Monroe,* 536 F.3d at 206 n. 9.

With respect to the first criminal matter, plaintiff was afforded court-appointed counsel and does not allege that the provision of counsel did not furnish him with the capability of bringing his challenges before the courts.  Rather, with respect to his appointed counsel, plaintiff solely appears to allege that he was dissatisfied with counsel's strategy and performance.  (See Doc. 1 at ¶ 43).  Premised upon this line of reasoning, plaintiff fails to state an access-to-courts claim, and we will dismiss this portion of said claim with prejudice. *See Bourdon v. Loughren*, 386 F.3d 88, 98 (2d Cir. 2004); *see also, Prater v. City of Philadelphia*, 542 F. App'x 135, 137 n. 4 (3d Cir. 2013) (per curiam); *Lindsey v. Shaffer*, 411 F. App'x 466, 469 (3d Cir. 2011)(per curiam); *Fisher v. DeRose*, No. 12-1014, 2013 WL 979457, at *2 (M.D. Pa. Mar. 12, 2013)(citing *Tinsley v. Del Rosso*, 2008 U.S. Dist. LEXIS 43259, at *10-*11 (D.N.J. May 30, 2008)(collecting cases)).

Regarding plaintiff's second criminal matter, he does not at all describe what underlying claims he lost as a result of not having more time in the law library or the possession of legal publications in his cell.  Plaintiff, instead, conclusively asserts that the outcome would have been different – namely, this criminal case would not have been bound over to a Court of Common Pleas -- had he possessed said materials in his cell and / or had more access to the law library. This is insufficient to state an access-to-courts claim; therefore, we will also dismiss this portion of plaintiff's claim, but without prejudice.[16]

### G. Free Exercise of Religion

Plaintiff alleges that on March 5, 2013, after testifying in favor of another inmate on trial for assaulting correctional officers, he was placed in the RHU and his

---

[16]     Although it is not addressed by the Moving Defendants, plaintiff also alleges that as a result of losing his commissary privileges, he could not send legal mail.  (See Doc. 1 at ¶ 97).  To the extent plaintiff raises an access to courts claim, it will be dismissed without prejudice since he does not describe what claims he lost by not being able to send legal mail.  *See also*, *supra*, Footnote 15.

personal property was confiscated.  (See Doc. 1 at ¶ 100).  Among the personal property

confiscated was a "personal Bible" that plaintiff earned after completing a Bible study

course.  (Id. at ¶¶ 100, 102).  According to plaintiff, this Bible was later destroyed.  (See id.).

Based on these allegations, the Moving Defendants argue that plaintiff fails to state a Free

Exercise claim under the First Amendment.  (Doc. 35 at 26-27).

      To state a claim for relief under the First Amendment's Free Exercise

Clause, a prisoner-plaintiff is required to allege a religious belief that is sincerely held, to

which he sought to exercise but was prevented from doing so by a government.  *See*

*Heleva v. Kramer*, 214 F. App'x 244, 246 (3d Cir. 2007)(per curiam)(quoting *DeHart v. Horn*,

227 F.3d 47, 51 (3d Cir. 2000)).  No substantial burden requirement has been imposed on

these First Amendment claims.  *Id.* at 247 n. 2, citing *Williams v. Morton*, 343 F.3d 212, 217

(3d Cir. 2003); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002)).

      Liberally construed, we understand plaintiff to be alleging a sincere belief

that he was required to read the Bible as part of his religious beliefs.  Moreover, we infer

that plaintiff was not given access to, or possession of, another Bible, preventing him from

engaging in this sincerely-held religious belief.  Thus, initially, plaintiff appears to state a

viable claim.  *Cf. Payne v. Duncan*, No. 13-2203, 2014 WL 1653136, at \*5-\*6 (M.D. Pa. April

24, 2014)(denying plaintiff's Free Exercise claim because, *inter alia*, plaintiff did not allege

that he was actually prevented from exercising any religious belief; instead "[plaintiff] merely

allege[d] that, as a Muslim, he [was] supposed to read and study . . . his religion and that

the removal of his books prevented him from doing so.").

      If a plaintiff properly alleges the aforementioned elements, we must "then

apply the four-factor test set forth in *Turner v. Safley*, 482 U.S. 78 (1987), to determine

whether the curtailment at issue is 'reasonably related to penological interests.'" *Heleva*,

214 F. App'x at 246 (quoting *DeHart*, 227 F.3d at 51).  Specifically:

> [T]he Supreme Court directed courts first to assess whether there is a "'valid, rational connection' between [a] prison regulation and [a] legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. If the interest is legitimate and neutral, and the connection is valid and rational, then courts should engage in the inquiries under the succeeding three prongs: whether "alternative means of exercising the right . . . remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and, finally, whether there are "ready alternatives" to the rule that would accommodate prisoners' rights at *de minimus* cost to penological interests. *Id.* at 90–91.

*Wolf v. Ashcroft*, 297 F.3d 305, 307 (3d Cir. 2002).

The burden of persuasion in challenging the reasonableness of a curtailment

of religion ultimately rests on the prisoner-plaintiff, but the government has the "slight"

burden of demonstrating the first factor.  *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir.

2012).  While the connection between a curtailment and a legitimate governmental interest

may be a matter of common sense in certain circumstances, such that a ruling on the first

factor based solely on pleadings may be appropriate, there are situations in which the

connection is not so apparent and requires factual development.  *Wolf*, 297 F. 3d at 308.

"Whether the requisite connection may be found solely on the basis of 'common sense' will

depend on the nature of the right, the nature of the interest asserted, the nature of the

prohibition, and the obviousness of its connection to the proffered interest" and "[t]he

showing required will vary depending on how close the court perceives the connection to

be."  *Id.* at 308-09.  Furthermore, the first factor is "foremost" in the sense that a rational

connection is a threshold requirement.  *See id.* at 309.  Thus, the remaining *Turner* factors

need not be considered if this threshold factor is not satisfied.  *See id.*

Construing the allegations in plaintiff's favor, we find that it is presently unclear whether the curtailment involved in this matter was rationally related to a legitimate penological interest.  While the Moving Defendants contend that plaintiff's placement in the RHU was for his previous escape attempt, and that the confiscation of his personal property may have been warranted under those circumstances, (see Doc. 35 at 26), we understand plaintiff to be alleging that he was placed in the RHU, and his Bible ultimately confiscated, for illegitimate, retaliatory reasons, after he testified in favor of the other DCP inmate. Accepting plaintiff's line of reasoning as true, as also apparently set forth in the complaint, more factual development is required before we may address the remaining *Turner* factors and determine whether plaintiff has sufficiently stated a claim for relief under the Free Exercise Clause.  This claim will therefore be allowed to proceed.

### H.  Plaintiff's Personal Property

Plaintiff claims that some of his personal property was confiscated and intentionally damaged or destroyed by correctional officers while he was confined in the RHU, at the DCP.  (See, e.g., Doc. 1 at ¶¶ 99 - 102).  Plaintiff, however, alleges that post-deprivation remedies were available.  (See id. at ¶¶ 31, 99).  Consequently, plaintiff cannot prevail on a claim for the confiscation and destruction of, or damage to, his personal property.  *See Gannaway v. Berks County Prison*, 439 F. App'x 86, 92 (3d Cir. 2011)(per curiam), citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 422 (3d Cir. 2000).  These claims will thus be dismissed with prejudice.

*I.  Cell and Body-Cavity Searches*

According to plaintiff, between March and May 2013, he was required to submit to 139 cavity and cell searches conducted by a "handful" of correctional officers. (Doc. 1 at ¶ 94).  We understand plaintiff to be complaining that these searches were unreasonable, in violation of the Fourth Amendment, and the Moving Defendants argue for dismissal.  (See Doc. 35 at 15-17).

With respect to the cell searches, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Shakur v. Coelho*, 421 F. App'x 132, 135 (3d Cir. 2011)(per curiam)(quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).  Accordingly, this portion of plaintiff's Fourth Amendment claim will be dismissed with prejudice.

Regarding the body-cavity searches plaintiff allegedly endured, the Supreme Court requires that, for pretrial detainees and convicted prisoners alike, these type of strip searches, conducted on less than probable cause, must be conducted reasonably.  *See Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979); *Miller v. Trometter*, No. 11-CV-811, 2012 WL 5933015, at *15 (M.D. Pa. Nov. 27, 2012)(citing *Payton v. Vaughn*, 798 F.Supp. 258, 261-62 (E.D. Pa. 1992)); *see also, Dunn v. White*, 880 F.2d 1188, 1191 (10th Cir. 1989)(recognizing that a prisoner's privacy interest in the integrity of his own person is still preserved post-*Hudson*).  "Strip searches that are excessive, vindictive, harassing, or unrelated to any legitimate penological interest may violate the Fourth Amendment." *Terrell v. Hendricks*, No. 11-832, 2012 WL 5335074, at *5 (D.N.J. Oct. 25, 2012)(citing as example, *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988)).  With respect to the test of "reasonableness," it "is not capable of precise definition or mechanical application.  In each

case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell,* 441 U.S. at 559 (citations omitted).

Here, plaintiff claims that he was subjected to 139 body-cavity searches within a three-month period, and these searches occurred each night.  (Doc. 1 at ¶¶ 58, 64, 66).  Moreover, according to plaintiff, the body-cavity and cell searches would occur simultaneously, lasting for approximately 30 minutes combined and interfering with his ability to sleep.  (Id.).  Plaintiff, however, does not detail these searches, and we are unable to otherwise infer that they were conducted unreasonably.  Consequently, these Fourth Amendment search claims will also be dismissed, but without prejudice.[17]

### J.  Conditions of Confinement

The bulk of plaintiff's complaint appears to be aimed at the conditions of his confinement at the DCP.  The Moving Defendants contend that certain aspects of this claim should be dismissed.  (Doc. 35 at 17-26).  The Moving Defendants, however, address these claims by blending the analyses for convicted prisoners and pretrial detainees.  (See id.).  Given our discussion, *supra,* in Footnote 9, we will defer ruling on the respective arguments until after plaintiff files an amended complaint, assuming he includes these claims, or until

---

[17]     It is unclear whether plaintiff raises a Fourth Amendment claim against Walton for the alleged strip search occurring on March 27, 2013.  To the extent that plaintiff raises such a claim, it can proceed because the allegations suggest that the sole purpose of the search was to embarrass, humiliate, and / or harass plaintiff after he informed maintenance about how the toilet in his cell became clogged.

the time for him to do so has expired, upon supplemental motion by the Moving

Defendants.[18]

### K. Retaliation

A First Amendment retaliation claim generally requires "(1) constitutionally

protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from

exercising his constitutional rights, and (3) a causal link between the constitutionally

protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285,

296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). "To establish

the requisite causal connection a plaintiff usually must prove either (1) an unusually

suggestive temporal proximity between the protected activity and the allegedly retaliatory

action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren*

*W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  "[T]he key question in determining

whether a cognizable First Amendment claim has been stated is whether 'the alleged

retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his

First Amendment rights.'"  *Thomas*, 463 F.3d at 296 (quoting *McKee v. Hart*, 436 F.3d 165,

170 (3d Cir. 2006)).

Plaintiff adamantly alleges that his placement in the RHU as well as the

conditions of confinement he incurred from March 5 to May 7, 2013, was in retaliation for

having testified on behalf of another inmate who was facing criminal charges for assaulting

correctional officers.  (See Doc. 1 at ¶¶ 46-48).  The Moving Defendants argue that

plaintiff's retaliation claim should be dismissed because he fails to show a causal link

between his decision to testify in favor of the other inmate and his placement in the RHU.

---

[18]     Since we ultimately give plaintiff leave to file an amended complaint, he shall attempt to
provide clarification as to which defendant he intends to sue for these claims.

(Doc. 35 at 29).  The Moving Defendants, instead, contend that plaintiff's complaint "reflects that he was placed [there] because of his efforts to escape from prison through his cell wall." (Id.).

Since the Moving Defendants do not take issue with whether plaintiff satisfies the first two elements, neither do we.  Regarding the third element, the thrust of the Moving Defendant's argument here, while one of plaintiff's criminal docket sheets suggests that he attempted to escape from the DCP on the same date that he was returned to the RHU on March 5, 2013, we do not know at what time of the day he attempted to escape nor do we have any evidence that we may presently rely upon concerning the escape.  Such information is critical because, for example, plaintiff could have attempted to escape following his placement back in the RHU, after testifying and after the retaliation had already initiated.  Furthermore, assuming the retaliation had already been initiated, without more facts, it would be nearly impossible for us to determine whether it was his attempted escape or previous conduct (of testifying) that triggered the further conditions of confinement he allegedly endured.  Consequently, we find that plaintiff has stated a plausible claim for relief, and it will be allowed to proceed.

V.    Leave to Amend

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). The Court "must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend." *Id.*

In this case, plaintiff will be given an opportunity to file an amended complaint.  In doing so, plaintiff may amend any of the claims discussed herein that will be

dismissed without prejudice; claims that will be allowed to proceed; and those not addressed by the Moving Defendants.  Plaintiff may also amend any of his conditions-of-confinement claims, even though they were not specifically addressed in this Memorandum, based on our discussion in Footnote 9.

Plaintiff is cautioned that an amended complaint supersedes the original complaint and must be "retyped or reprinted so that it will be complete in itself including exhibits." M.D. Pa. LR 15.1. Consequently, all causes of action alleged in the original complaint, which are not alleged in the amended complaint, will be considered waived.

Plaintiff is also advised that an amended complaint must contain this action's docket number and should be labeled "Amended Complaint." In addition, an "amended complaint must be complete in all respects. It must be a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed." *Young v. Keohane*, 809 F.Supp. 1185, 1198 (M.D. Pa. 1992).  Like the original, the amended complaint must be concise and direct.  *See* Fed.R.Civ.P. 8(d).  Each allegation must be set forth in individually numbered paragraphs in short, concise, and simple statements. *Id.* The allegations should be specific enough as to time and place, and should identify the specific person or persons responsible for the deprivation of his constitutional rights and what each individual did that led to deprivation of his rights.  *Ashcroft v. Iqbal*, 556 U.S. 662,  676 (2009). Plaintiff must also specify the relief he seeks with regard to each claim.

Plaintiff's failure to file an appropriate amended complaint, within the required time set by us, will result in the Court proceeding only on those claims allowed to proceed; those not discussed by the Moving Defendants; the conditions-of-confinement

claims as currently pleaded; and any state-law claims that have a valid jurisdictional basis. Illegible submissions will be returned to plaintiff without consideration.

VI.    <em>Conclusion</em>

The Moving Defendant's motion to dismiss will be granted in part, denied in part, and deferred in part.  Plaintiff will also be given leave to file an amended complaint.  An appropriate Order will be issued.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge