IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANDTHONY RAY SPEARS,                    :
                                        :
        Plaintiff                       :
                                        :        CIVIL NO. 1:CV-13-3053
    vs.                                 :
                                        :         (Judge Caldwell)
JOSEPH A. CURCILLO, III, *et al.*,      :
                                        :
        Defendants                      :

*M E M O R A N D U M*

I.    *Introduction and Procedural History*

        The *pro se* plaintiff, Andthony Ray Spears, filed this 42 U.S.C. § 1983 action

against various Dauphin County employees related to his confinement at the Dauphin

County Prison.  Presently before the court is Defendants' Motion to Dismiss the Amended

Complaint.  Defendants argue: (1) many of the claims have already been dismissed with

prejudice, when we ruled on Defendant's motion to dismiss the original complaint; (2)

Plaintiff fails to allege the personal involvement of many of the defendants; and (3) Plaintiff

otherwise fails to state a claim based on verbal harassment, retaliation, excessive use of

force or Defendants' deliberate indifference to his conditions of confinement.  Spears does

not oppose Defendants' motion.

        The original complaint named thirty-one individuals employed by Dauphin

County.  On Defendants' motion to dismiss, we dismissed some claims with prejudice and

dismissed others with leave to file an amended complaint on those claims.  *Spears v. Curcillo,* 2015 WL 7016366 (M.D. Pa. Nov. 12, 2015).

The Amended Complaint names twenty-eight defendants (Carnazzo, Carroll, Cline, Corkle, Cramer, Curcillo, Danner, DeBolphi, DeRose, Faulker, Frankenstein, Haste, Hewitt, Hostetter, Hostler, Jeszenka, Klahar, Lavery, Neidigh, Nichols, Pope, Shay, Singleton, Smith, Stewart, Swanson, Walton and Zimmerman).  Defendants are sued in their individual and official capacities.  The following individuals, although named in the original complaint, were not named in the Amended Complaint and were therefore dismissed from the action on January 7, 2016: Alek Peters, Connie Orosz, and Jim Yanic.

Also pending is Defendants' motion to prevent the disclosure of the home addresses of Defendants Corkle, Carnazzo, Cramer, Frankenstein and Yanic.

For the reasons that follow, Defendants' motion to dismiss the Amended Complaint will be granted in part and denied in part, with the following being the only remaining claims: (1) a Fourth Amendment claim against DeRose for the thrice-daily visual body-cavity searches; and (2) an Eighth Amendment claim against Walton for the March 27, 2013, visual body-cavity search.  Defendants' motion to prevent the disclosure of the home addresses of the five unserved Defendants will be dismissed as moot.

II.   *Standard of Review*

A motion to dismiss under Fed. R. Civ. P 12(b)(6) authorizes the dismissal of a complaint "for failure to state a claim upon which relief can be granted."  Under Fed. R. Civ. P. 12(b)(6), the district court must "accept all factual allegations as true, construe the

complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff is entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  When considering the plaintiff's claims, the court may consider the allegations of the complaint, documents attached to or specifically referenced in the complaint, and matters of public record.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Pursuant to Fed. R. Civ. P. 8(a), a complaint need only "include a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."  "[T]he factual allegations of a complaint 'must be enough to raise a right to relief above the speculative level' and the complaining party must offer 'more than labels and conclusions' or 'formulaic recitation of the elements of a cause of action.'"  *W. Run Student Hous. Assocs., LLC. v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)).  Legal conclusions are "not entitled to the assumption of truth."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012)(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).  Where a complaint has not alleged sufficient facts to state a claim for relief that is "plausible on its face[,]" dismissal is appropriate.  *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949.

Additionally, pro se pleadings must be liberally construed and "held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Fantone v. Latini*, 780 F.3d 184 (3d Cir. 2015) (citing *Haines v. Kerner*, 404 U.S. 519, 520 - 21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972)); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). As such, a pro se complaint should be liberally construed, *Hunterson v. DiSabato*, 308 F.3d 236, 243 (3d Cir. 2002), so "as to do substantial justice." *Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004) (citations omitted).

Pro se litigants are to be granted leave to file a curative amended complaint even when a plaintiff does not seek leave to amend, unless such an amendment would be inequitable or futile. *See Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 861 (3d Cir. 2014). A complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Grayson v. Mayview State Hospital*, 293 F.3d 103, 106 (3d Cir. 2002).

III.   *Background*

Spears' twelve-page, single-spaced, typewritten Amended Complaint is somewhat disorganized and does not present his claims chronologically. To the extent possible, we have attempted to decipher his claims and put them in chronological order. Briefly, Spears asserts the following claims: (1) Defendant DeRose and Stewart placed him in the RHU in retaliation for his trial testimony on behalf of another inmate; (2) Defendants Singleton and Stewart denied him access to cleaning supplies for seven days while housed

in a filthy feces-smeared cell; (3) Frankenstein issued him a false misconduct for destroying his mattress; (4) Capt. Neidigh threatened him and placed him on mattress restriction; (5) Pope and Hostler gave him a damaged mattress on March 25, 2013; (6) Frankenstein scattered his legal materials about during a search of Spears' cell; (7) Shay pushed his chest; (8) Walton subjected him to an improper and humiliating visual body-cavity strip search; (9) unidentified officers subjected him to visual body-cavity searches three times a day while he was in restricted housing; (10) Shay refused to provide him with a clean mattress; and (11) Faulkner, Danner, Hostler, Shay and Frankenstein forced him to shower wearing ankle and wrist restraints.

Plaintiff alleges as follows.  At all times relevant to this action, he was confined at the Dauphin County Prison (DCP) in Harrisburg, Pennsylvania.[1]  (ECF No. 56, Am. Compl.)  Spears claims to have been a pretrial detainee from October 25, 2010, through May 18, 2013, and a convicted offender from thereon.[2]  (*Id.*, p. 4, n. 1).  He attaches over 270 pages of documents to his Amended Complaint which he claims are grievances and appeals he filed related to his various claims.[3]  (*Id.*, p. 4).  He claims

---

[1]  Spears is currently housed at the state correctional institution in Benner Township, Pennsylvania.  *See* Doc. 63.

[2]  Defendants have provided various court orders demonstrating that when Spears was housed at DCP during the events he alleges in his Amended Complaint, he was not a pre-trial detainee but a parole violator and then a convicted parole violator.  *See* ECF Nos. 60-2, 60-3 and 60-4.  Thus for the purposes of this uncontested motion to dismiss we will address Spears' claims as if he were a convicted inmate and not a pretrial detainee.

[3]  There is little to no guidance by Spears as to which documents are related to his specific claims and/or Defendants.  Additionally, the documents are not in chronological order or sorted by
(continued...)

Curcillo, Lavery, Haste, DeRose, Carroll, Nichols, Stewart, Corkle, Jeszenka, Klahar, Neidigh, Zimmerman, Carnazzo, Hostetter, Hewitt, Smith and Cramer[4] "allegedly investigated" his "plethora" of grievances or responded to his grievance appeals but failed to correct the violations committed by others and manipulated the record to cover the actions of "their officers."  He claims their participation in the grievance review process demonstrates that these Defendants "knew of and acquiesced in" the various violations he grieved.

Spears alleges that DeRose, Neidigh, Haste and Curcillo are "liable" for denying him "any exercise, out-of-cell time or access to the gym from 11/18/2011 - 03/13/2012, 04/10/12 - 10/06/12, 10/08, 11th, 29th & 30th 2012."  (ECF No. 56, p. 6).  He claims he was treated by medical staff during this time for chronic constipation and lost over twenty pounds.  (*Id.*)

Between July 23, 2012, and July 31, 2012, Spears was placed on "strip-cell status" in the institution's restricted housing unit (RHU).  (*Id.*, p. 4).  During this time he could not wash his hands after using the toilet or before eating.  He also claims he could not sleep due to 24/7 lighting in his cell and the lack of bed linens and because unidentified officers would kick his cell every fifteen minutes.  (*Id.*)  DCP segregation inmates are "not

---

[3](...continued)
topic.  Nonetheless, where it can be ascertained that these documents relate to a specific claim, we will consider them.

[4]  We will refer to these individuals as the supervisory Defendants.

permitted to turn off the lights due to other inmates being potentially suicidal," resulting in Spears' suffering from sleep deprivation. (*Id.*, p. 5).

Spears was placed in the RHU under Disciplinary Custody status after his July 23, 2012, receipt of an incident report stemming from a fight between two other inmates on his block. Spears was not personally involved in the fight. (*Id.*) His legal materials were temporarily confiscated but were returned within twenty minutes. (*Id.*) He was denied hygiene products and linens during this time. (*Id.*) Spears alleges that per DCP policy, inmates housed in the disciplinary segregation unit, are placed on "strip-cell status." He was on strip-cell status from July 23 through July 31, 2012. During this time he could not wash his face or hands, receive mail, or possess linens. His light was on 24/7 and officers kicked his door every fifteen minutes. (*Id.*)

Documents attached to the Amended Complaint reveal that all inmates housed on Spears' block were reclassified to RHU status on July 23. (ECF No. 56-3, pp. 1-5). Spears, like every other inmate on his housing unit, received a disciplinary write-up notifying him of the charge lodged against him. At his misconduct hearing, he was advised of his rights and had the opportunity to testify in his own behalf. After all evidence was reviewed he was found guilty of "threatening staff and inciting a riot." (*Id.*, pp. 6-9). Additionally, video footage from the block on that day shows officers removing property from Spears' cell at approximately 10 a.m. and property "allowed on RHU status being returned" to him at 10:19 a.m. The confiscated property was inventoried. On July 30, 2012, upon his release from RHU status, Spears signed for and received the remainder of

his property.  (*Id.*)  His sheets, towels and hygiene items were not confiscated as they are

allowed on RHU status.  (*Id.*)

Spears alleges the Supervisory Defendants "created such policies that

directly violated" his civil rights.  (*Id.*)  He claims that DCP has policies that prohibit inmates

in the RHU on Disciplinary Custody from having any reading materials in their possession.

Spears claims he was in the RHU for 95% of his stay at the DCP.  Also, per DCP policy,

inmates on segregation unit P3 are required to be handcuffed and shackled at all times

they are out of their cell.  This includes when showering.  He also claims there is "no

recreation time" for P3 inmates and that he was permitted out of his cell Monday through

Friday for only thirty minutes per day.  (*Id.*, p. 5).  Showers were offered Mondays,

Wednesdays and Fridays, and Tuesdays and Thursdays were "utilized" to clean cells.

Spears was housed on P3 during the following periods: March 15, 2013, through May 7,

2013; and July 25, 2013, through August 13, 2013.  (*Id.*, p. 5).  He claims he could not

properly clean himself in the shower while restrained.  The "defendants deliberately

disregarded Plaintiff's health and safety by creating and enforcing such policies."  (*Id.*)

Inmates housed in P3 are prohibited from turning off their lights due to "being

potentially suicidal."  (*Id.*)  This practice interfered with his ability to sleep and caused him to

suffer from migraines and depression.  In March 2013 he received medication from the

institution's Psychiatrist.  (*Id.*)

Spears claims the Supervisory Defendants "are directly responsible for" these

violations and "they knew of and acquiesced in their officer's actions and they created

these policies.  Most of the officers under these defendants, were only following the policies

that were created by" this group of Defendants (Curcillo, Lavery, Haste, DeRose, Carroll,

Nichols, Stewart, Corkle, Jeszenka, Klahar, Neidigh, Zimmerman, Carnazzo, Hostetter,

Hewitt, Smith and Cramer).  (Doc. 56, ECF p. 5).

   Next, Spears claims that between March 5, 2013, and August 13, 2013,

Defendants DeRose and Stewart placed him in the segregation unit in retaliation for his

March 5, 2013, trial testimony on behalf of another inmate and against the prison.  (ECF

No. 56, p. 6).  When Plaintiff returned from court that day, DeRose and Stewart ordered

officers to place him in a strip-cell with no mattress.  He was given "cold bag lunches for

breakfast, lunch and dinner."  (*Id.*)  When eventually given the opportunity to shower, he

was cuffed and shackled.  He was not permitted to receive any mail and did not have

access to any reading material, including a Bible, his rosary or other religious materials.

(*Id.*, pp. 6 and 11).  An officer was posted outside of his cell which was extremely cold.  He

had no soap, toilet paper or other hygiene items.  He was denied a visit from his legal

counsel, Ms. Ruby.  Spears was also subject to visual body-cavity searches three times a

day in a "degrading" manner.  (*Id.*, p. 7).  Plaintiff grieved these issues to DeRose, Nichols,

Stewart, Corkle, Jeszenka, Klahar, Neidigh, Zimmerman, Carnazzo, Curcillo, Lavery and

Haste.  (*Id.*).  Defendants tried to "justify their actions by placing the blame on Plaintiff for

an attempted escape."  (*Id.*)

   Documents attached to the Amended Complaint reveal that Spears received

a disciplinary report on March 5, 2013, for an attempted escape.  (ECF No. 56-3, p. 34).

Spears dug a hole in the wall of his cell (P1-9) "and [used his ] personal items to conceal [his] actions from staff." (*Id.*, p. 40).  His cell "was sealed with all content remaining in the cell pending investigation". (*Id.*, p. 34).  At the conclusion of the investigation, Spears' property, including his legal materials, were searched and then returned to him. Contraband and other items that could be used for escape were found and confiscated. Spears was then moved to the segregation unit and "classified as an extreme escape/security risk."  There is no evidence in the attachments to suggest Spears requested and was denied medical treatment during this time.  (*Id.*, ECF pp. 43-46).  On March 21, 2013, the temperature in Spears' cell was recorded as 67.4 degrees.  As Spears was on "one on one constant security watch it was necessary for the lights to be on at all times." (*Id.*, p. 34).  Further, due to Spears' escape attempt, the facility was temporarily placed on "lockdown status."  During this time Spears showered in accordance with DCP's lockdown policies. (*Id.*)  These precautionary actions were taken to safeguard the integrity of" the DCP.  (*Id.*, p. 35).  He was "strip searched more regularly and subject to cell inspections during each shift" because of his escape attempt.  (*Id.*, p. 40).

Spears claims that on March 18, 2013, he was moved to an unsanitary cell that "had human hair on the floor; a urine odor; and human feces smeared on the toilet, floor and walls."  (ECF No. 56, p. 7).  When Spears reported these conditions to Officer Singleton, he was advised that he would need Stewart's approval to obtain cleaning supplies.  "Plaintiff had no other option but to use his own wash cloth, soap, and bare hands to clean the cell."  (*Id.*)  He spent a total of seven days (not consecutively) in this cell

before he was provided with cleaning supplies to clean it.  Spears was housed in cell P3-1

from March 18, 2013, until March 21, 2013.  He was moved again into cell P3-1 on March

24, 2013.  (ECF No. 56-3, p. 67).  The cell was empty when Spears did not occupy it.  (*Id.*)

Two days later, on March 20, 2013, Frankenstein issued Spears an incident

report for allegedly "ripping a mat used to sleep on."  (ECF No. 56, p. 8).  Spears was

promptly escorted to meet with Capt. Neidigh who "was disrespectful and indirectly

threatened him."  (*Id.*)  Neidigh placed Spears on 12-hour mat restriction, "meaning that

Plaintiff could only possess a mat during the night hours."  (*Id.*)  When not in Spears' cell,

the mat was outside the cell.  The following day, after Plaintiff grieved this issue, Warden

DeRose sent a representative of the Mental Health Department to speak with Spears.  (*Id.*)

Consequently, Spears was placed on 15-minute suicide watch.  Capt. Neidigh also gave

him a new mat.  (*Id.*)

On March 25, 2013, Officer Miller collected the new mat that was sitting

outside of Spears' cell.  After advising Officer Miller that the mat was his, Officer Miller left it

outside the cell.  (ECF No. 56, p. 8).  Pope, however, directed Hostler "to grab [Spears']

mat."  (*Id.*)  When Spears complained, both Pope and Hostler laughed.  In exchange,

Spears "received the same mat for which he had originally been accused of ripping."  (*Id.*)

Concerned that he would again receive a misconduct for damaging this mat, Spears

advised DeBolphi what had transpired with Pope and Hostler.  DeBolphi took the ripped

mat and placed it under a staircase.  "Debolphi did the right thing."  (*Id.*, pp. 8-9).  Yet,

when Pope and Hostler learned what Debolphi did, they placed a mattress outside of

Plaintiff's cell that was in worse condition than the first mattress he was accused of damaging.  (*Id.*, p. 9).

The evening of March 25, 2013, when Plaintiff was out of his cell shaving, Frankenstein searched his cell.  When he returned, Spears noticed his legal materials "had been scattered about" but was "able to reorganize" them.  (*Id.*)  The same evening, Spears was presented with a mat that was in worse condition than any other he had previously received.  (*Id.*)  Around midnight, before his cell door was closed, he "tossed said mat out of his cell and did not have another one to sleep on."  (*Id.*)  Even though Frankenstein had already issued Spears a misconduct for the damaged mat, he issued Spears another misconduct.  (ECF No. 56-3, pp. 64 - 68).

The evening of March 26, 2013, Shay and another officer opened Spears' cell door to give him the mat he discarded the night before.  Spears "stood in the doorway of the cell to prevent the mat from being placed inside his cell.  In response, Shay pushed Plaintiff in the chest and threw the mat inside Plaintiff's cell."  (ECF No. 56, p. 9).  Around 11 p.m., after being permitted to clean his cell, Spears again tossed the mattress out of his cell.  He did not want the mattress because he did not want to receive another misconduct for damaging the same mat.

The morning of March 27, 2013, Spears advised Walton that his toilet was clogged.  (ECF No. 56-3, p. 52).  After maintenance was called and resolved the issue, Walton learned that Spears had clogged the toilet with stuffing from his mattress.  Walton then told Spears that "when maintenance leaves, you're stripping!"  (*Id.*)  Walton then

subjected Spears to a visual body cavity strip search.  When Spears handed each article of

clothing to Walton, it was thrown in the dirty toilet water that had pooled on the floor in his

cell.  Walton then threw Spears' personal property (his uniform top and bottom, two sheets,

blanket, socks, boxers, t-shirt, gym shorts, and thermal top) in the toilet water.  (*Id.*; *see

also* ECF No. 56-3, p. 52).[5]  Walton, during the strip search, knowing that Spears was

convicted (i.e. not a pretrial detainee), said to him, "That big nigger Bubba is going to love

that tight white ass when you get upstate!"  (*Id.*, p. 10).  Walton also referred to Spears as a

"little dick faggot that is always causing problems."  (*Id.*)  Walton issued Spears a

disciplinary report for destroying a mattress and clogging his toilet.  (ECF No. 56-3, p. 52).

Later that morning, sewage started to spew from the drain outside of Spears'

cell.  As his mat was over the drain, it absorbed some of the sewage.  (ECF No. 56, p. 10).

When given this mat, Spears tossed it out of his cell.  (*Id.*)  Frankenstein then searched

Spears' cell and issued him another disciplinary report for damaging the mat.  (*Id.*)  Prison

officials reviewed videotape of Spears forcing his mattress out of his cell.  *See* ECF No. 56-

3, p. 65.  "[T]he video was reviewed and it is documented that the mattress was in fact in

your cell from 8:00 p.m. until 9:11 p.m.  At that time, you forced the mattress out of your

cell.  In order to get your mattress out of your cell, which you admit to doing, you forced it

through the wiki door.  This could only be accomplished by removing more of the stuffing,

thereby creating further destruction to County property."  (*Id.*)  Spears was placed in the

---

[5]  Spears says his thermal bottoms, towel and washcloth were not thrown in the dirty water.
*See* ECF No. 56-3, p. 52.  Contradicting the above statement, he also says his t-shirt was not
thrown in the dirty water.  (*Id.*).

strip-search cell for three days following this incident and was not provided a mat.  Spears claims he felt like a "WWII P.O.W."  (*Id.*, p. 11).

Finally, Spears claims that his Bible, rosary and other religious items that were confiscated on March 5, 2013, were never returned to him.  He also alleges he was not permitted to participate in Lenten prayers or provided a meat substitute during Lent.  (*Id.*, p. 11).  Prison officials note that in March 2013  Spears never requested a Bible or any other religious materials.  (ECF No. 56-3, p. 39).

As of March 2013, Spears had incurred twenty-five disciplinary write-ups with the majority of the misconducts being for damage to county property, possession of contraband, possessing contraband items that can be used in escape attempts, inappropriate behavior towards staff, disruptive behavior and an attempted escape.  (ECF No. 56-3, p. 38).  DCP RHU guidelines permit officials, when dealing with inmates who "continue to exhibit abnormal behavior and or the unwillingness to conform with the rules and regulations of the Dauphin County Prison," to impose "additional sanctions or restrictions . . . ."  "Some of the additional sanctions or restriction[s] listed include: Restrictions on visitation, recreation, showers, use of additional restraints while out of cell, reclassification to segregation and the filing of criminal charges."  (*Id.*)  Spears fell into this category of inmates.  Although not allowed access to the institution's gym, Spears was provided with "rec time [   ] on [his] block."  (*Id.*)

IV.    *Discussion*

A.    *Previously Dismissed Claims*

Defendants argue that Spears presents the following claims in his Amended Complaint which we previously dismissed with prejudice: (1) claims under the Fifth Amendment; (2) claims premised on a theory of *respondeat superior* against Curcillo, Lavery, Haste, Stewart, Jeszenka, Klahr, Zimmerman, Hostetter, Hewitt and Smith for their review of prison grievances; (3) Fourth Amendment claims related to cell searches; (4) access-to-courts claims related to his first criminal matter where he was represented by a public defender;[6] (5) the destruction of personal property; (6) claims for declaratory and injunctive relief.

Defendants are correct.  We previously dismissed these claims with prejudice.  *See* ECF No. 51, pp. 15-18 and pp. 23-24; *see also* ECF No. 52.  For the reasons set forth in our memorandum, dated November 12, 2015, these claims will be dismissed with prejudice.

---

[6]  We note that Spears did not included his access-to-courts claim related to his alleged lack of adequate time in the prison law library in anticipation of his preliminary hearing for attempted escape in the Amended Complaint.  *See* ECF No. 56.  Accordingly, his access-to-courts claim related to his second criminal matter is deemed waived.

B.   *Lack of Personal Involvement of Defendants Curcillo, Lavery, Haste, Carroll, Nichols, Corkle (not served), Jeszenka. Klahar, Neidigh, Zimmerman, Carnazzo (not served), Hostetter, Hewitt, Smith, Cramer (not served), DeBolphi, Cline and Swanson.*[7]

Defendants contend Spears fails to allege the personal involvement of each of the Defendants identified above.  We agree.

A section 1983 claim cannot be premised on a theory of *respondeat superior.* In order to establish liability for deprivation of a constitutional right, a party must show the personal involvement of each defendant.  *Iqbal*, 556 U.S. at 676, 129 S.Ct. at 1948; *Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010).  "It is uncontested that a government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct."  *Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 71-72 (3d Cir. 2011).  This personal involvement can be shown where a defendant personally directs the wrongs, or has actual knowledge of the wrongs and acquiesces in them.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207(3d Cir. 1988); *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)(noting that "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations").  A defendant "cannot be held responsible for a constitutional violation which he or she neither

---

[7] Based upon our review of the Amended Complaint, Spears alleges personal involvement against the following Defendants: DeRose, Stewart, Singleton, Neidigh, Frankenstein (not served); Shay; Walton; Faulker; Danner and Hostler.  The claims against these Defendants will be addressed below.

participated in nor approved." *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201-202 (3d Cir.

2000).  Thus, individual liability can be imposed under Section 1983 only if the state actor

played an "affirmative part" in the alleged misconduct.  *Rode*, 845 F.2d at 1208.  Merely

alleging that an individual defendant had personal knowledge or involvement in depriving

the plaintiff of his rights is insufficient to establish personal involvement.  *Id.*

Spears names twenty-eight Defendants in this action.  As previously noted,

he asserts claims based on the theory of *respondeat superior* against many of them.  Other

Defendants he fails to mention at all in the Amended Complaint.  If Spears is attempting to

show Defendants' personal involvement by his submission of the 270-plus pages of exhibits

attached to his Amended Complaint, he fails.  He is still required to comply with the

requirements of Fed. R. Civ. P. 8(a).  He simply fails to allege that the above-named

Defendants had personal involvement in any of his identifiable claims.  A generic assertion

that "the Defendants" are responsible for his alleged violations are insufficient for pleading

purposes.  Because Spears was previously advised of his need to identify each

Defendants' personal involvement in his claims, and was given leave to do so but failed, he

will not be granted another opportunity to do so.  The above-named defendant will therefore

be dismissed from this action.

C.    *Spears' Retaliation Claim*

in order to prevail on a retaliation claim, a plaintiff must show three things: (1)

he engaged in constitutionally protected conduct; (2) he suffered, at the hands of a state

actor, adverse action sufficient to deter a person of ordinary firmness from exercising his

constitutional rights; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011).  Even if "a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenging decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to legitimate penological interest."  *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

Spears claims Defendants DeRose and Stewart directed his placement in the RHU "strip-cell" between March 5 and March 15, 2013, in retaliation for his testimony on behalf of another inmate in an action involving the prison.  It is doubtful that being a witness at a civil trial is a constitutional right.  *See Santos v. Secretary of D.H.S.*, 532 F. App'x 29, 33 (3d Cir. 2013)(nonprecedential)("there is no constitutional right under the First Amendment to testify as a witness during the trial of another person").  Plaintiff nonetheless fails to state a claim.

Given the timing of Spears' court testimony and his placement in the RHU, a causal connection can be inferred, both direct and circumstantial.  Spears states "defendants attempted to justify their action by placing the blame on Plaintiff for an attempted escape."  (ECF No. 56, p. 7).  As part of their motion to dismiss, Defendants provide a copy of the affidavit of probable cause for the criminal charges filed against Spears as a result of his tunneling activities, possession of a weapon and witness intimidation. (ECF No. 60-1, pp. 2-7).  Based on these documents, we take judicial notice of

Spears' September 9, 2013, guilty plea to criminal attempt - escape, among other charges, related to the events of March 5, 2013.  *See Commonwealth v. Spears*, CP-22-CR-2198-2013 (Pa. Ct. Com. Pl. Dauphin Cnty.).  *See Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)(judicial proceedings constitute public records and courts may take judicial notice of them).  Given this information, Spears fails to demonstrate that his constitutionally protected conduct was a substantial or motivating factor in the decision to place him in the RHU.

       D.     *Frankenstein's Alleged Falsified Misconduct Reports for Repeated Destruction of Spears' Mattress*

Spears claims that Defendant Frankenstein repeatedly issued him false misconduct reports for allegedly damaging the same tattered mattress.  This claim does not rise to the level of a constitutional violation.  The Third Circuit has held that "due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly falsified evidence and groundless misconduct reports."  *Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d Cir. 2002).  Thus, as "long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim."  (*Id.*)  Because Plaintiff's claim is based solely on the issuance of false misconducts, and does not call into question the process he received on those misconducts, this claim will be dismissed.

E.   *Capt. Neidigh's Verbal Threats*

Plaintiff alleges that on March 20, 2013, Capt. Neidigh "was disrespectful and indirectly threatened" Spears after Plaintiff received a disciplinary report for ripping his mattress.  (ECF No. 56, p. 8).  Spears does not allege that these threats were accompanied by any physical or other abuse.

It is well-settled that verbal threats or taunts, standing alone, do not violate the Eighth Amendment.  *See Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (nonprecedential)("[V]erbal threats or taunts, without more, are not sufficient to constitute a violation of the Eighth Amendment.") (citations omitted).  Accordingly, this claim will be dismissed.

F.   *Visual Body-Cavity Strip Searches*

Plaintiff makes two claims regarding visual body-cavity strip searches.  He first alleges that, as a result of his escape attempt, he was placed in an RHU strip-search cell.  During this time, which might have been from March 5, 2013, through March 14, 2013, or perhaps longer, unidentified officers subjected him to visual body-cavity strip searches three times a day, once during each shift.  His cell was also subject to search each shift.

He also alleges that on March 27, 2013, when maintenance was fixing a clog in Spears' toilet, officer Walton told Spears that "when maintenance leaves, you're stripping!"  Walton then subjected Spears to a visual body-cavity strip search during which Walton: (1) threw Plaintiff's clothing into the dirty toilet water that had pooled on the floor of the cell; and (2) told Plaintiff "That big nigger Bubba is going to love that tight white ass

when you get upstate!" and that Plaintiff was a "little dick faggot that is always causing problems."

"[T]he Fourth Amendment . . . grants inmates a limited right of bodily privacy, subject to reasonable intrusions necessitated by the prison setting." *Parkell v. Danberg*, ____ F.3d ____, ____, 2016 WL 4375620, at *5 (3d Cir. 2016).

> "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559, 99 S.Ct. 1861. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* Inmate search policies are constitutional if they "str[ike] a reasonable balance between inmate privacy and the needs of the institutions." *Florence* II, 132 S.Ct. at 1523.

*Id.*

In *Parkell*, the Third Circuit held that thrice-daily body-cavity searches of a convicted prisoner in disciplinary custody could violate the Fourth Amendment as the searches, on the record before the court, were not reasonably related to the prison's legitimate interest in detecting and deterring contraband, given the inmate's isolation in a restricted-housing cell. *Id.* at *7. Similarly, in the instant case, Spears was subjected to thrice-daily visual body-cavity searches regardless of how little contact he had with other individuals as he was in restricted housing. Defendant Warden DeRose appears to justify the increased number of such strip searches on the need to increase security based on Plaintiff's attempted escape and his disciplinary infractions. (ECF No. 56-3, p. 40).

Nonetheless, at this stage of the litigation, we will allow this Fourth Amendment claim to proceed against defendant DeRose.

A strip search can violate the Fourth Amendment, but it can also violate the Eighth Amendment if it was conducted maliciously or to harass or humiliate the inmate. *Parkell*, 2016 WL 4375620, at *13.  The allegations against CO Walton states an Eighth Amendment claim for the March 27, 2013, strip search.

G.   *Spears' Access-to-Court Claim against Frankenstein*

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).  In order to state a claim of the denial of access to the courts, a prisoner must allege that his efforts to pursue a non-frivolous legal claim were hindered due to defendant's actions and that he suffered actual harm.  *See Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 2187, 153 L.Ed. 413 (2002).  The inmate must plead facts showing how his claims "may no longer be pursued as a result of defendant's actions."  *Monroe*, 536 F.3d at 206 n. 9.

Spears alleges that on March 25, 2013, while he was out of his cell, Frankenstein searched it.  (ECF No. 56, p. 9).  Upon his return "he discovered that his legal materials had been scattered about.  Plaintiff, though, was able to reorganize those materials."  (*Id.*)  Based on these allegations, Spears fails to state an access-to-courts claim as he has failed to allege, and based no his own statement he could not allege, he incurred an actual injury as a result of the shuffling of his legal papers.  Defendants' motion

to dismiss this claim will be granted. Plaintiff will not be granted leave to replead this claim as it would be futile.

H.     *Spears' Excessive-Force Claim against Shay*

The Eighth Amendment protects an inmate from a correctional officer's use of excessive force.  *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). "The core inquiry of an excessive-force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Fennell v. Cambria Cnty. Prison*, 607 F. App'x 145, 148 (3d Cir. 2015) (nonprecedential) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010)).  The reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386-87, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).  "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins, supra*, 559 U.S. at 37, 130 S.Ct. at 1178 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)).

"The relevant factors for a court to consider are: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Giles v. Kearney*, 571 F.3d 318, 328 (3d Cir. 2009)(citing *Brooks, supra*, 204 F.3d at 106). Although

the extent of injury is relevant, the inmate does not need to sustain serious injury to state an excessive-force claim.  *Wilkins*, 559 U.S. at 36 - 38, 130 S.Ct. at 1178-79.

Spears alleges that on March 26, 2013, Shay "pushed Plaintiff in the chest and threw the mat inside Plaintiff's cell" as Spears stood in the doorway of his cell attempting to prevent Shay from placing the mattress in his cell.  (ECF No. 56, p. 9). Spears does not allege he was injured by this "push" or that he required medical treatment following this event.  The physical force used was brief and limited in duration.  It was minimal force to address Spears admitted attempt to use his body as a physical blockade to interfere with Shay's objective of providing Spears with a mattress.  Thus, based on the allegations of the Amended Complaint, Spears fails to suggest that CO Shay's "push" was anything beyond a trivial/minimal use of force and is insufficient to constitute a violation of the Eighth Amendment.  This claim will be dismissed.

I.       *RHU Conditions of Confinement*

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials.  U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). However, not all deficiencies and inadequacies in prison conditions amount to a violation of an inmate's constitutional rights.  Likewise, the Eighth Amendment does not mandate that prisons be free from discomfort.  *Id.* at 832, 114 S.Ct. at 1976.

Prison conditions may amount to cruel and unusual punishment contrary to the Eighth Amendment if they cause "unquestioned and serious deprivations of basic

human needs . . . [that] deprive inmates of the minimal civilized measure of life's necessities." *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 417-18 (3d Cir. 2000) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).  To state an Eighth Amendment conditions-of-confinement claim, an inmate must satisfy both an objective and subjective test.  Namely, the prisoner must allege facts plausibly showing (1) objectively, his conditions were so severe that they deprived him of an identifiable, basic human need, such as food, clothing, shelter, sleep, recreation, medical care, and reasonable safety, and (2) defendant was deliberately indifferent to the risk of harm to the plaintiff's health or safety.  *See Allah v. Ricci*, 532 F. App'x 48, 50-51 (3d Cir. 2013)(nonprecedential)(citing *Farmer*, 511 U.S. at 834-37, 114 S.Ct. at 1977-79; *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)). "However, only 'extreme deprivations' are sufficient to present a claim for unconstitutional conditions of confinement."  *Dockery v. Beard*, 509 F. App'x 107, 112 (3d Cir. 2013)(nonprecedential)(citing *Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S.Ct. 995, 999-1000, 117 L.Ed.2d 156 (1992)).

"[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.  The Eighth Amendment does not mandate that prisons be free of discomfort.  *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000.  Only "extreme deprivations" are sufficient to make out an Eighth Amendment claim.

*Id.* Again, whether the required showing has been made depends on a number of factors "includ[ing] the length of confinement, the amount of time prisoners must spend in their cells each day, the opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation and showers." *Tillery v. Owens*, 907 F.2d 418, 427 (3d Cir. 1990).

As to the subjective component, the question is whether the defendant acted with deliberate indifference to the inmate's health or safety. *Hudson*, 503 U.S. at 8, 112 S.Ct. at 999. Thus, when considering a claim under the Eighth Amendment, courts must inquire as to whether "the officials act[ed] with a sufficiently culpable state of mind" and whether the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation. *Id.*

In reviewing this type of claim, the courts have stressed the importance of the duration of the complainant's exposure to the alleged unconstitutional conditions, and a review of the "totality of the circumstances," as being critical in the Eighth Amendment determination, and not just the allegedly egregious conditions themselves. *Rhodes*, 452 U.S. at 362-33, 101 S.Ct. at 2407.

The denial of toilet facilities, or exposure to one's own waste, alone does not automatically equate to an Eighth Amendment violation. *See Wheeler v. Walker,* 303 F. App'x 365, 368 (7th Cir. 2008)(nonprecedential) (rejecting an Eighth Amendment claim where the prisoner alleged that during a two-week period he had only a thin blanket to protect him from frigid air entering his unheated cell; roaches crawled over him while he

tried to sleep on a badly torn mattress; urine and waste "encrusted" the sink and toilet; trash, dirt, and debris covered floors, walls and sink; and the stench of waste came from the broken toilet); *Davis v. Scott*, 157 F.3d 1003, 1004 (5th Cir. 1998) (holding a three-day placement in a cell with blood on the walls and excrement on the floors did not meet Eighth Amendment's objective component); and *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996)(inmate confined in cell for four days "made to endure the stench of [his] own feces and urine," did not rise to the level of an Eighth Amendment violation).

In this case, Spears' conditions-of-confinement claims are premised on (1) his placement in a filthy cell for seven days when he was able to clean some of the cell on his own but a stench remained until he was provided cleaning supplies; (2) his receipt of a dirty and damaged mattress; (3) his placement on mattress restrictions; (4) lack of adequate out-of-cell time; and (5) being required to shower while wearing restraints.  These alleged violations took place while Spears was housed in the RHU following the discovery of his escape attempt.  We will address each condition in turn.

(i)     *Spears' March 18, 2013, Placement in a Filthy Cell*

Spears claims that he was moved into an unsanitary cell that had hair on the floor, an odor of urine, and feces smeared on the toilet, floors and walls.  (ECF No. 56, p. 7).  Spears was housed in cell P3-1 from March 18, 2103, through the early morning of March 21, 2013.  He was again moved to cell P3-1 on March 24, 2013.  No other inmate was housed in cell P3-1 in the interim.  Additionally, records show that no inmate had occupied that cell for several months prior.  (ECF No. 56-3, pp. 64 and 67).  When he

notified Singleton of these conditions "Singleton informed Plaintiff that he needs approval from Stewart to obtain cleaning supplies because individuals housed in the RHU are only permitted to clean their cells on Tuesdays and Thursdays." (ECF No. 56, p. 7). Plaintiff concedes that the institution was in a "lockdown" status at this time which was due to his escape attempt and pending investigation. (ECF No. 56-3, pp. 63-64).

Taking the allegations as true, Spears was able to clean his cell on March 18, 2013, with items he had in his cell. He claimed a stench remained "despite [his] best cleaning efforts." (ECF No. 56, p. 7). These allegations fail to state an Eighth Amendment violation. While unpleasant, Spears admits only an odor remained after his cleaning efforts on March 18, 2013. His complaints amount to nothing more than allegations of uncomfortable living conditions, which again, do not rise to the level of an Eighth Amendment claim. Additionally, it is noted that documents attached to the Amended Complaint reveal that Plaintiff seen by medical professionals during their rounds in the segregation housing unit and expressed no medical complaints. Specifically he was seen on March 20, 23, 24, 25 and 26, 2013. (ECF No. 56-3, p. 43).

(ii)    *Mattress Issues*

Spears' mattress issues range from his receipt of a damaged mattress, being placed on mattress restrictions, and a three-day period where he did not possess a mattress.[8]

---

[8]  Although Spears alleges that he was without a mattress from March 5, 2013, through August 13, 2013, other averments in his Amended Complaint contradict this statement. *See* ECF

(continued...)

On March 20, 2013, Spears received a misconduct for damaging his mattress.[9]  He admits to receiving a new mattress on March 21, 2013, but was placed on mattress restrictions and only had access to his mattress "during the night hours."  (ECF No. 56, p. 8).  Spears was placed on mat restrictions after damaging his mat.  He does not claim he had an extended period of time where he did not have a mattress to sleep on; rather, it was not available to him during the daylight hours.[10]  Again, he was seen several times by the medical department and denied any medical problems.  Thus, the mattress restrictions complained of that occurred between March 20, 2013, and March 27, 2013, do not rise to the level of an Eighth Amendment claim.

To the extent he was without any mattress at all between March 27-30, 2013, denying a prisoner a mattress for a limited period of time is not a deprivation of a basic human need and does not constitute cruel and unusual punishment.  *See Schaeffer v. Schamp*, No. 06-CV-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008) (holding that plaintiffs "claims that he was placed in a hard cell for ten days without a mattress, soap, toilet paper, running water, legal supplies, his prescription medication and only received one meal a day" were insufficient to constitute an Eighth Amendment violation); *Williams v.*

---

[8](...continued)
No. 56, pp. 6, 8 - 10.

[9]  As we have previously rejected Spears' claim that he was given false misconducts for damaging his mattresses, we will not revisit that issue here.

[10]  Spears claims that on March 25 and 26, 2013, he did not have a mat to sleep on but admits that he threw the one he was given out of his cell and did not receive another one. Defendants were not personally involved in the deprivation of his mattress on those days.

*Campbell*, No. 07-CV-885, 2008 WL 2816089, at *4 (E.D. Pa. July 18, 2008) ("[N]umerous courts in this circuit have concluded that the failure to provide an inmate with a mattress for a limited number of days does not constitute cruel and unusual punishment."), citing *Schaeffer v. Schamp*, *supra*; *and Castro v. Chesney*, 1998 WL 767467, at *8 (E.D. Pa. Nov. 3, 1998).  The removal of a mattress or bedding supplies for short periods of time "is not sufficient to constitute 'wanton and unnecessary infliction of pain.'" *Castro*, 1998 WL 767467, at *8.  Accordingly, Spears' Eighth Amendment claims related to his mattress will be dismissed for failure to state a claim.

      (iii)    *Denial of Adequate Out-of-Cell Time While Housed in the RHU*

      Spears claims that between March 15, 2013, and May 7, 2013, and then again between July 25, 2013, and August 13, 2013, he was denied adequate time out of his cell.  During this time, he alleges he was only out of his cell Monday through Friday for thirty minutes.  Monday, Wednesday and Friday, he was permitted to shower while Tuesdays and Thursdays were "utilized" to clean cells.  He claims he had no recreation time or gym time.  (ECF No. 56, p. 5).  Documents supplied by Spears contradict the averments of the Amended Complaint.  In these documents he states he is allowed thirty minutes of recreation two times a week, Tuesday and Thursday, but is cuffed and shackled during this time.  (ECF No. 56-3, p. 38).

      The Third Circuit has recognized that meaningful recreation is "'extremely important to the psychological and physical well-being of prisoners.'" *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir.1988) (citation omitted).  The lack of exercise may rise to a

constitutional violation where it poses a significant threat to an inmate's physical and mental well-being. *French v. Owens*, 777 F.2d 1250. 1255 (7th Cir. 1985) (pointing out that lack of exercise may rise to a constitutional violation only "where movement is denied and muscles are allowed to atrophy, [and] the health of the individual is threatened"). Spears claims that his limited out-of-cell exercise time "made him feel like a rabid animal." (ECF No. 56, p. 5).

Even if Spears only received recreation time two days a week during this six-week period, this does not constitute cruel and unusual punishment. At most he went without a recreation period for four days in a row. During this four-day period he was permitted out of his cell twice to shower. Denial of recreation for a short period, per se, is not a constitutional violation; again, the totality of Spears' RHU confinement must be assessed. He was regularly visited by medical staff while making their rounds in the segregation unit, and Spears does not allege that his health was affected due to the deprivation of additional recreation time.

(iv)   *Denial of Showers without Restraints*

Spears alleges that although he was allowed to shower during his RHU stay, the fact that he was handcuffed and in ankle shackles during his shower denied him the ability to properly shower. He claims he was unable to properly clean himself due to Defendants' security measures. However, he fails to allege he suffered any harm as a result of this practice. Accordingly, there is insufficient evidence to support a finding that any of the named defendants knew of and disregarded a substantial risk to his health as a result of him being restrained while showering. Likewise, his objections to the practice of

restraints for RHU inmates while showering alone fails to rise to the level of an Eighth Amendment claim as it fails to demonstrate that he was denied the minimal civilized measure of life's necessities.

Reviewing the allegations of the Amended Complaint with respect to the totality of his RHU conditions of confinement, Spears fails to state a claim for which relief can be granted.

J.      *Defendants' Motion to Prevent the Disclosure of Home Addresses*

On August 14, 2014, Spears was notified that the court was unable to serve Defendants Corkle, Carnazzo, Cramer, Frankenstein, and Yanic due to his failure to provide a proper address for them.  (ECF No. 37).  To date Spears has failed to provide the requested information; he requested Defendants assistance in this matter.  In turn, the court asked Defendants whether they could provide contact information for these five unserved Defendants.  (ECF No. 48).  Defendants then filed a motion to prevent the public disclosure of the Defendants' contact information.   (ECF No. 49).

Given our resolution of the Defendants' Motion to Dismiss, there is no need to serve these five defendants, and therefore, Defendants' motion to prevent the disclosure of their home addresses will be dismissed as moot.  First, Spears waived all claims against Defendant Yanic when he failed to name him in the Amended Complaint.  As for Defendants Carnazzo, Cramer and Corkle, Spears failed to allege their personal involvement in any of the alleged unconstitutional acts and therefore all claims against them will be dismissed.  Finally, as to Defendant Frankenstein and as discussed in this

memorandum, all claims against him are to be dismissed with prejudice.  Accordingly,

Defendants' motion to prevent the disclosure of Carnazzo, Cramer, Corkle, Frankenstein

and Yanic's home addresses will be dismissed as moot.

V.     *Conclusion*

Based on the above, Defendants' motion to dismiss the Amended Complaint

is granted in part and denied in part.  Two claims will survive the motion to dismiss: (1) the

Fourth Amendment claim against DeRose for the thrice-daily visual body-cavity searches;

and (2) the Eighth Amendment claim against Walton for the March 27, 2013, visual body-

cavity search.  All other Defendants and all other claims will be dismissed from the action.

Defendants DeRose and Walton will be required to file an Answer to the Amended

Complaint.

We will issue an appropriate order.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge


Date: September 29, 2016